IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, for
the use of SUNDANCE ROOFING, INC.,

    Plaintiffs                                       No:    CIV 09-00441-MV-WDS

v.

HDR ENTERPRISES, LLC, MV
INDUSTRIES, INC., and
LIBERTY MUTUAL INSURANCE
COMPANY,

    Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on Defendants MV Industries, Inc.'s ("MVI") and Liberty Mutual Insurance Company's ("Liberty Mutual") Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, which was filed June 9, 2009 (Doc. 6). The Court has reviewed the motions, the memorandum and exhibits submitted by the parties, and the relevant authorities. The Court concludes that the motion to dismiss must be **DENIED**.

I. FACTUAL AND PROCEDURAL BACKGROUND

This case is brought by Sundance Roofing, Inc. for alleged nonpayment for work performed under a subcontract with Defendant HDR. Plaintiff alleges to the best of its knowledge and belief that Defendant MVI entered into a contract with the United States of America for materials and labor for the construction of the National Atomic History Museum (the "Museum") in Albuquerque, New Mexico, and that MVI in turn subcontracted with

1

Defendant HDR, who in turn subcontracted with Plaintiff Sundance Roofing, Inc. for certain specified concrete work which would advance completion of the main contract.  Plaintiffs have alleged equitable and common law claims of breach of contract, unjust enrichment and *quantum meruit*, as well as federal law claims under the Miller Act.  *See* Doc. 1, pp. 3-6.

Defendants MVI and Liberty Mutual argue that this Court does not have subject matter jurisdiction over this case because the Miller Act does not apply.  They argue: 1) construction of the Museum is not properly deemed a federal project or a public works project, therefore the Miller Act does not apply (*see* Doc.6, para. 7) ; and 2) because the obligee on the bond is listed as the "National Atomic Museum Foundation," rather than the U.S. government, the bond in question is not a Miller Bond.  *See* Doc. 6, pp. 2-3.  The bond, which has been submitted to this Court as Defendants' Exhibit 3, names MVI as Principal, Liberty Mutual as Surety, and the National Atomic Museum as Obligee.  The bond states that the underlying contract is between the Obligee and the Principal, for the benefit of The National Museum of Nuclear Science and History.  *See Def.'s Ex.* 3.  The bond indicates that its purpose is to ensure payment "for all labor and material used or reasonably required for use in the performance of the Contract".  *See Def.'s Ex.* 3, p. 2.

II.  MOTIONS TO DISMISS UNDER FED. R. CIV. P. 12(b)(1)

Under Fed. R. Civ. P. 12(b)(1) a complaint may be dismissed for lack of subject matter jurisdiction.  Since the only basis for federal jurisdiction claimed in this complaint is the Miller Act (*See* Doc. 1), we will consider whether this Court has jurisdiction under that Act.

When considering a 12(b)(1) motion, the court may look beyond the pleadings to determine subject matter jurisdiction and such reference to materials outside the pleadings does

not convert the motion to a Rule 56 motion for summary judgment.  *See Gardner v. United States Gov't*, 2009 U.S. Dist. LEXIS 71107, *12 (D.N.M. 2009); *quoting Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1296 (10th Cir. 2003); *see also Kane v. Christian Bros.*, 2006 U.S. Dist. LEXIS 95365, *17-18 (D.N.M. Dec. 20, 2006); *see also Alto Eldorado Partners v. City of Santa Fe*, 2009 U.S. Dist. LEXIS 49697, *58-59 (D.N.M. Mar. 11, 2009).

Indeed, in considering a 12(b)(1) motion, a court *may not* presume the truth of the allegations asserted in the complaint and has wide discretion to consider other evidence.  *See e.spire Communs., Inc. v. Baca*, 269 F. Supp. 2d 1310, 1319 (D.N.M. 2003); *see also Montana v. Lampert*, 262 Fed. Appx. 914, 917 (10th Cir. 2008); *see also Pringle v. United States*, 208 F.3d 1220, 1222 (10th Cir. 2000); *see also Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1224 (10th Cir. Colo. 2004).

III.  MILLER ACT

The Miller Act, 40 U.S.C. § 3131 *et seq*., requires that before a contract of more than $100,000 is awarded for construction, alteration or repair of any public building or public work of the U.S. Government, a performance bond and payment bond must be supplied, which become binding once the contract is awarded.  *See* 40 U.S.C. § 3131.  The payment bond, at issue here, allows a subcontractor or materialman having a direct contractual relationship with the subcontractor, but no contractual relationship with the contractor furnishing the bond, to bring a civil action on the payment bond where such subcontractor/materialman has not been paid for its services/materials.  *See* 40 U.S.C. § 3133.

A. PURPOSE OF THE MILLER ACT

The purpose of the Miller Act has been summarized by the Tenth Circuit as follows:

> The Miller Act, 40 U.S.C. § 270a, was intended to provide a remedy for suppliers of labor and material to a federal project. These suppliers do not have their usual security interest because a lien cannot attach to federal property. Miller Act protection goes to those who have a contractual agreement with a prime contractor or a subcontractor.

*Kennedy Electric Co. v. United States Postal Service*, 508 F.2d 954, 957 (10th Cir. 1974); *citing F. D. Rich Co., Inc. v. United States*, 417 U.S. 116, 122, 40 L. Ed. 2d 703, 94 S. Ct. 2157 (1974).

The Supreme Court and the Tenth Circuit have held that the Miller Act is to be liberally construed so as to effectuate its intent of protecting those who provide labor and/or material for the construction of public works. *See United States v. Carter*, 353 U.S. 210, 216-17, 1 L. Ed. 2d 776, 782-783, 77 S. Ct. 793, 796-97 (1957); *see also United States ex rel. Cortez III Serv. Corp. v. PMR Constr. Servs.*, 117 Fed. Appx. 661, 664 (10th Cir. 2004); *see also Borrett-Moore & Associates v. United States*, 367 F.2d 122, 123 (10th Cir. 1966);[1] *see also United States use of Moody v. American Ins. Co.*, 835 F.2d 745, 747 (10th Cir. 1987).

---

[1] "The Miller Act is highly remedial in nature. It is entitled to a liberal construction and application in order [to] properly effectuate the Congressional intent to protect those whose labor and materials go into public projects . . . Ostensibly the payment bond is for the protection of 'all persons supplying labor and material in the prosecution of the work' and 'every person who has furnished labor or material in the prosecution of the work' is given the right to sue on such payment bond." *quoting McEvoy Co. v. United States*, 322 U.S. 102, 107, 64 S. Ct. 890, 893, 88 L. Ed. 1163 (1944).

B.  WHAT CONSTITUTES A FEDERAL BUILDING OR PUBLIC WORK UNDER THE MILLER ACT

Plaintiff argues that the Project was a "public works" project because "the new Museum building was built on federal government property, to house a federally-chartered museum, using a large proportion of federal government dollars."  Doc. 7, p. 6.  Plaintiff has supplied a copy of land records demonstrating ownership by the U.S. Government of the real property upon which the museum is located.  *See Pl.'s Ex. A.*  Defendants MVI and Liberty Mutual argue that this is not a public works contract because MVI contracted with the National Atomic Museum Foundation as owner of the Museum, not the U.S. Government, and the National Atomic Museum Foundation is registered in the State of New Mexico as a non-profit 501(c)(3) corporation.  *See* Doc.6, p. 1, paras. 1-2.

Defendants MVI and Liberty Mutual cite a seminal case, *United States to the Use of Noland Company, Inc. v. Irwin et al.*, wherein the Supreme Court considered the question of what constitutes a public work under the Miller Act.  316 U.S. 23, 28, 62 S. Ct. 899, 902, 86 L. Ed. 1241, 1244 (1942).  In *Noland*, the Supreme Court found that "the question of title to the buildings or improvements or to the land on which they are situated is no longer of primary significance" in interpreting what is a public work.  In defining a public work, the *Noland* court looked to the National Industrial Recovery Act which was passed two years before the Miller Act, and which defined "public works" as "'any projects of the character heretofore constructed or carried on either directly by public authority or with public aid to serve the interests of the general public.'"  The Court noted that this definition of a public work is not "not technical, but plain and specific." *Noland* at 1244.

Here it is clear that the National Atomic Museum is just such a public work. As stated below, the National Atomic Museum was chartered by Congress; its intent is to serve the general public through providing education on nuclear science, its development and uses,[2] and thus it fits within the definition of a public work.

Nonetheless, Defendant MVI argues that in order for a project to be a public works project, the United States must be a party to the contract, and points to *United States of America for the Use of Jack L. Miller t/d/b as Miller Lumber Company v. Mattingly Bridge Co., Inc., et. al.*, wherein a Kentucky federal district court found that the construction of an interstate highway was not a public project or work where the United States had not contracted for the construction of the highway. 344 F. Supp. 459 (W.D.KY 1972). However, the *Mattingly* court distinguished the case it was considering from another case which is more analogous to the current case at hand, *Gamerston & Green*. In *Gamerston & Green*, construction began at the Presidio, a U.S. military reservation, for a new post library. Modified contracts and invitations to bid utilized the name of the fund set up for construction of the project, "'Special Facility Fund." When a supplier of material and labor for the project sought to sue under the Miller Bond, the defendants argued that since the United States was not the counterpart to the contract the Miller Act did not apply. The court rejected this argument, finding that the Fund had acted at the behest of the U.S. Government. *See The United States of America for the use of Gamerston & Green Lumber*

---

[2] *See* the Museum's website at http://www.nuclearmuseum.org/general-information/ ("the National Atomic Museum . . . was established in 1969 as an intriguing place to learn the story of the Atomic Age, from early research of nuclear development through today's peaceful uses of nuclear technology. Visitors can explore how nuclear science continues to influence our world. The museum strives to present, through permanent and changing exhibits and displays, the diverse applications of nuclear energy in the past, present and future along with the stories of the field's pioneers.")

*Company v. Phoenix Assurance Company of New York, et.al.*, 163 F. Supp. 713 (S. Cal. 1958).

Similarly, in the instant case, public records show that the National Atomic Museum Foundation was incorporated in 1993 for the purpose of furthering the programs of the National Atomic Museum, including educational and public relations programs, and running the Museum store.[3] Defendants state: "In the case at bar, it is unknown for certain whether federal funds were used to construct the museum." Doc.6, p. 6. This is incorrect. Readily-available information regarding the Museum indicates that the Museum was charted by the U.S. Congress and is run by the Department of Energy.[4] Congress officially recognized the National Atomic Museum, originally located at Kirtland Air Force Base, as the only official United States Atomic Museum, and provided for its operation and funding by the Department of Energy in December, 1991. *See* 102 P.L. 190, 3137. It was relocated after the September 11, 2001 attacks due to safety concerns, and the new building received substantial federal funding.[5] It continues to be recognized as the official atomic museum of the United States and is operated by the Department

---

[3] *See* the National Center for Charitable Statistics at http://nccsdataweb.urban.org/PubApps/showVals.php?ft=bmf&ein=850404628.

[4] *See* "National Atomic Museum - Overview" at http://www.atomictourist.com/natatom.htm ("Operated by the Department of Energy (DOE), the National Atomic Museum contains a large collection of declassified nuclear technology. Since its opening in 1969, the objective of the National Atomic museum has been to provide a readily accessible repository of educational materials, and information on the Atomic Age. In addition, the museum's goal is to preserve, interpret, and exhibit to the public memorabilia of this Age. In late 1991 the museum was chartered by Congress as the United States' only official Atomic museum.")

[5] *See* "National Atomic Museum to embrace diverse history, use of technology," *Albuquerque Tribune*, February 18, 2008 ("The federal government has since contributed $5 million to the new facility . . . and corporate, state and private donations have added an additional $3.5 million).

of Energy, under Congressional Statute 42 USCS § 7142.  The Museum's website proclaims that "The National Museum of Nuclear Science & History is the nation's only congressionally chartered museum in its field . . . Originally known as the National Atomic Museum, it was established in 1969 on Kirtland Air Force Base before moving to Old Town."  *See* www.nuclearmuseum.org.  Evidence indicates that the U.S. Department of Energy continues to be heavily involved in financing.  *See* "Atomic Museum receives a mass of dough from DOE," *New Mexico Business Weekly*, (May 16, 2003) ("The National Atomic Museum in Albuquerque on Friday received a big financial boost from the U.S. Department of Energy toward the museum's $18 million capital campaign to build a brand new facility.  DOE owns the museum, which is operated by Sandia National Laboratories."); *see also* "DOE allocates money to nuclear science museum," *New Mexico Business Weekly* (July 25, 2008) ("The U.S. Department of Energy has released $738,770 in funds for the National Museum of Nuclear Science and History in Albuquerque . . . [U.S. Congressman] Domenici helped break ground for the facility in 2006 after helping secure $4.25 million for the project.").[6]  As in the Supreme Court case of *Noland*, the National Atomic museum was "directly and specifically authorized by Congress and money ha[s] actually been appropriated for it."  *Noland* at 1244.

---

[6] *See also FY 1994 BUDGET OVERVIEW - ATOMIC ENERGY DEFENSE ACTIVITIES: Question and Answers Before the* House Appropriations Committee, Subcommittee on Energy and Water Development (April 28, 1993), available at http://www.fas.org/spp/starwars/congress/1993_h/h930428q.htm ("'Mr. Bevill: How much funding is provided for the National Atomic Museum in Albuquerque, New Mexico, in FY 1992, FY 1993 and FY 1994?'

Dr. Beckner: 'The National Atomic Museum received $411,000 in FY  1992, and will receive an estimated $504,000 in FY 1993, including  $70,000 to move one exhibit, and an estimated $465,000 in FY 1994.'")

Thus, even though Defendant MVI is correct that the United States Government itself is not officially a party in name to the bond/contract, the National Atomic Museum operates under the Department of Energy and is funded by the U.S. government, and the National Atomic Museum Foundation is clearly acting under authority of the U.S. government. The Miller Act therefore applies. As stated in *Gamerston & Green, supra*, "The test is not whether there was a formal contract in the name of the United States, but whether there was a contract 'for public building or public work of the United States.' If the person or agency making the contract for the public building, or public work, on behalf of the United States had the authority to so contract, it is immaterial whether the contract is made in the name of the United States or such person or agency. To construe the Act otherwise would be to give it a narrow rather than a liberal construction . . . The liberal construction required is that which is necessary to carry congressional intent as expressed in the Act." 163 F. Supp. 713 at 715.

Defendant MVI has provided this Court with a letter from the President of the Board of Trustees of the National Atomic Museum Foundation, Mr. Charles Loeber, which, after breaking down funding from the City of Albuquerque and the State of New Mexico states, in part, "this is not a public works project" and therefore wage reporting requirements of the State of New Mexico need not be met. *See Def.'s Ex. 1*. Mr. Loeber appears to be referring to the New Mexico Public Works Minimum Wage Act and the wage reporting requirements set by the State of New Mexico Department of Workforce Solutions for winning bidders on New Mexico public works contracts; he is clearly not referring to federal regulations. *See* N.M. Stat. Ann. § 13-4;[7]

---

[7] Note that federal aid projects are specifically exempted under § 13-4-3. *See also* http://www.nmcpr.state.nm.us/nmac//parts/title11/11.001.0002.htm.

9

Therefore, Defendant MVI seems to be taking Mr. Loeber's comments out of context.  While it may be true that this project did not meet the definition of a *New Mexico State* public works project, and therefore need not follow New Mexico State guidelines for New Mexico public works projects (an issue we need not address here), this project was properly deemed a federal public works project.

Defendants MVI and Liberty Mutual have also supplied a request for bids from Studio Southwest Architects, Inc., in which Studio Southwest has stated "This is not a federal project and federal procurement rules do not apply."  *See Def.'s Ex.* 2.  This entity has not been named as a party in this suit, nor have any of the parties defined what this entity's role was in this construction project, therefore it is unclear why a bid request from this entity would be pertinent to Defendants' argument.  However, this murkiness is immaterial because a statement by an architectural firm, whatever its role in this construction, that the project is not a federal project is not authoritative.  A simple statement in a bid proposal that a construction project is not subject to the Miller Act is not a valid means of escaping Miller Act requirements; if it were, the Miller Act would be entirely ineffectual.

### C.  WHAT CONSTITUTES A MILLER ACT BOND

Defendants MVI and Liberty Mutual argue that the bond in question is not a "Miller Act Bond" because the U.S. Government is not named on the bond documents.  Plaintiffs counter that the Foundation is a "quasi-governmental entity, whose sole purpose is to operate the Museum (created by the federal government), on federal land, using a large proportion of federal government money" and that therefore finding the bond to not be a "Miller Act Bond" would be to "exhalt [*sic*] form over substance."  *See* Doc. 7, p. 5, para. 3.A.

In *United States for the Use of Hillsdale Rock Co., Inc. v. Cortelyou & Cole, Inc.*, the Ninth Circuit addressed a similar set of facts and determined that although the Miller Bond in question was not set up exclusively for the benefit of the United States Government, and was not identical to the standard form used for a Miller bond, it nonetheless complied with the essential requirements of a Miller Act bond and served the function of a Miller Act bond. 581 F.2d 239 (9th Cir. 1978). The court reasoned:

> It is clear that, whatever may be the labels assigned to the various tiers of contractors here, [the third tier subcontractor] stood functionally and practically in exactly the position which the essentially remedial Miller Act was calculated to benefit and protect. We find no compelling argument against this rationale, and therefore, conclude that, insofar as the position of the respective contractors is concerned, the bond in issue is a Miller Act bond.

581 F.2d 239, 242 (1978).

Similarly, in the instant case, plaintiff Sundance Roofing is exactly the type of supplier that the Miller Act was designed to protect. Further, as in *Hillsdale Rock*, there appears to be little question that the work performed by Plaintiff was the type of work intended to be covered by the Miller Act. *Id.* at 243. Therefore, jurisdiction properly rests with this Court under the Miller Act.

IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,  **IT IS ORDERED** that  Defendants MV Industries, Inc.'s and Liberty Mutual Insurance Company's Motion to Dismiss (Doc. 6) is **DENIED** with prejudice.

**DATED** this 30th day of March, 2010.

_____
**MARTHA VAZQUEZ**
**UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **Plaintiff**<br>**Sundance Roofing, Inc.**<br>*United States of America, for the use of on behalf of*<br>Sundance Roofing, Inc. | represented by **David T. Thuma**<br>Jacobvitz, Thuma & Walker, PC<br>500 Marquette Avenue, NW<br>Suite 650<br>Albuquerque , NM 87102<br>505-766-9272<br>Fax: 505-766-9287<br>Email: dthuma@jtwlawfirm.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | represented by **Edward A. Mazel**<br>Jacobvitz, Thuman & Walker, P.C.<br>500 Marquette, N.W.<br>Suite 650<br>Albuquerque , NM 87102<br>505-766-9272<br>Fax: 505-766-9287<br>Email: emazel@jtwlawfirm.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**
**HDR Enterprises, LLC**

represented by **Lee Boothby**
New Mexico Legal Center, P.C.
515 Gusdorf Rd
Suite 8
Taos , NM 87571
575-751-7415
Fax: 575-758-7377
Email: jleeboothby@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**
**MV Industries, Inc.**

represented by **John W Rebstock**
Calvert & Menicucci, PC
8900 A Washington NE
Albuquerque , NM 87113
(505) 247-9100
Email: jrebstock@hardhatlaw.net
*ATTORNEY TO BE NOTICED*

**Michael F. Menicucci**
Calvert Menicucci PC
8900 Washington St
Albuquerque , NM 87113
(505) 247-9100
Fax: 505-247-4761
Email: mmenicucci@hardhatlaw.net
*ATTORNEY TO BE NOTICED*


**Defendant**
**Liberty Mutual Insurance Company**

represented by **John W Rebstock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael F. Menicucci**
(See above for address)
*ATTORNEY TO BE NOTICED*